*Enola M.* **THOMAS**, Appellant,

v.

**MANDELL & WRIGHT,** Appellees.

No. 15335.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Sept. 12, 1968.

Rehearing Denied Oct. 3, 1968.

Newton B. Schwartz, Houston, Mack H. Hannah, III, Port Arthur, of counsel, for appellant.

David Bland, Houston, Barrow, Bland & Rehmet, Houston, of counsel, for appellees.

Joseph D. Jamail, John Gano, W. James Kronzer, Houston, amici curiae.

COLEMAN, Justice.

This is a suit to rescind a contract by which appellant employed appellees to represent her in the prosecution of a claim arising out of the death of her husband, and by which a portion of the cause of action was conveyed to appellees as compensation for the services to be rendered by them. There is also involved the question of whether the assignment of interest contained in the contract can be enforced where the contract of employment was unilaterally terminated by appellant. Both parties asked for declaratory judgment and filed motions for summary judgment.

The trial court denied appellant's motion for summary judgment, and sustained that filed by appellees. Judgment was rendered that appellant take nothing by her suit. The court included in the judgment the following findings pursuant to the request for declaratory judgment:

"(a) The contract of 'Employment of Attorneys' dated the 27th day of October, 1966, a copy of which is attached to the First Amended Original Petition of Plaintiff, Mrs. Joseph (Enola M.) Thom-

as, on file herein, is legal, valid, and enforceable;

"(b) The contract of 'Employment of Attorneys' effects a transfer and assignment to Defendants, Mandell & Wright, a law partnership, and its partners, Arthur L. Mandell, Herman Wright, John N. Barnhart, Tom Kirtley and Sidney Ravkind of a one-third (⅓) undivided interest in all claims, actions, demands, or causes of action arising by operation of law for damages or other amounts due and owing to Plaintiff, Mrs. Joseph (Enola M.) Thomas, or the Estate of Joseph Thomas, Deceased, husband of Plaintiff, because of the death of said Joseph Thomas;

"(c) Also transferred and assigned by such 'Employment of Attorneys' contract is a one-third (⅓) undivided interest in any compromise or settlement of such claims, actions, demands, or causes of action; any judgment now rendered or hereafter to be rendered in connection with such claims, actions, demands, or causes of action; and any compromise and settlement of such judgment or judgments now rendered or hereafter to be rendered;

"(d) By reason of said contract of 'Employment of Attorneys', Mandell & Wright, a law partnership, and its partners, Arthur L. Mandell, Herman Wright, John N. Barnhart, Tom Kirtley and Sidney Ravkind are the legal owners of the one-third (⅓) undivided interests described in paragraphs (b) and (c) above."

The pleadings and motions before the court were unsworn. The summary judgment evidence consisted of an affidavit of Newton B. Schwartz, the deposition of appellant, and the depositions of appellees.

Since this is a summary judgment proceeding, the testimony must be viewed in the light most favorable to appellant and where a conflict in the testimony appears that given by Mrs. Thomas will be considered.

Joseph Thomas, appellant's husband, was employed aboard the vessel Gulfstag, and he lost his life when the vessel sank at sea. Surviving him were his wife and seven children. Six of these children were minors. The oldest son, however, was twenty years of age and a member of the Armed Services of this Country. Mrs. Thomas heard that her husband was missing between 6:30 and 7:00 o'clock A.M., October 24, 1966. About noon of that day Mr. Johnson, employed by the National Maritime Union, and Mr. Herman Wright called on her. Mr. Johnson introduced Mr. Wright and told her she would need a lawyer. There was no other conversation except that Mr. Johnson got one of Mr. Wright's business cards and wrote his (Johnson's) name and telephone number on the back of it and gave it to her. He then told her that if she needed help she could call him at any time.

She stated that she remembered seeing Mr. Wright "the first day of this tragedy, if I am not mistaken, because that has been three months ago now. And like I say, I was in shock at the time." She also remembered telling them that her son was on his way home and that she wanted to wait until he got there before she did anything.

A few days later, probably on October 27, Mr. Patton, the agent at Port Arthur for the National Maritime Union, accompanied by Mr. Wright, called on her again. Her son was home on emergency leave and was present at this meeting. Mr. Patton didn't have anything to say other than, "Mrs. Thomas, this is N.M.U. lawyer. You go along with them and they will take care of you."

Later she said that Mr. Patton explained about the benefits from the union, and wages for the voyage on this occasion. She didn't remember who opened the conversation, but Mr. Wright told her that she would need a lawyer. She did not remember that he explained to her any type of benefit she was entitled to receive or that she expressed to him her concern about

the "financial picture of the family." Mr. Wright wrote down the names and ages of the children. He handed her the contract. She glanced over it, but didn't remember reading it. Mr. Wright explained to her about the one-third. She didn't remember whether her son read it or not, but they did not discuss it. She recognized her signature. With reference to the contract she said: "I probably glanced over this but I don't remember reading anything in here. I don't remember anything that was said."

In answer to the question, "Who opened the conversation?", she answered: "Well, that's—I'm trying to get to that. I think Mr. Wright told me—No, I don't think I know. Mr. Wright did tell me that all the others had signed with him but he did not give me any time—I did not see any names."

Mrs. Thomas testified later in the deposition as follows:

"Q All right. Now, is that all that happened, now, at the meeting of October 27th?

"A That's all I can recall. As I said, he said he would come back because they needed more information.

"Q All right. And I believe—

"A And then—this is something else that I remember Mr. Wright saying to me—then I thought about it afterward. He said—when he told me about he had signed all the rest up. And then he said, 'Now, we are going to—'

"Now, that was after I had signed this. When I had signed this then he told me this: He said, 'Now, we are going to represent you folks.' That was his words to me.

"Q You what?

"A You folk. Well, I took it for granted meant all those he had signed up.

"Q That was after?

"A After I signed this.

"Q I see.

"A Since then he began to tell me they was going to represent us. And he said, 'We are going to sue for one big amount. Then you, having the biggest family, will get more than the rest.'

"Now, he explained that to me."

Mr. Wright did not bring up any amount of money and she did not remember the terms "exoneration" or "limitation of liability" being used. Neither Mr. Wright nor Mr. Patton forced her to sign the employment agreement. When Mr. Patton came to see her after the controversy arose she told him that he did not in any way persuade her to sign with Mandell & Wright. Five days later she called Mr. Hannah and asked him if she could change lawyers. He told her that it was her privilege. She then asked if she could come to his office and see him. After this conversation she called Mr. Wright and told him she had changed her mind and did not want Mandell & Wright to represent her. She then visited Mr. Hannah and signed a contract with him providing for a one-third contingent interest fee. No one suggested that she go to see Mr. Hannah. She knew him, but not socially. She had never actually met him personally. He dictated a letter to Mandell & Wright confirming her telephone conversation and demanding the return of the contract which she read, signed and mailed.

Mrs. Thomas testified: "* * * This is what made me change my mind. After I came to myself I began to think of what Mr. Mandell had said about representing all of us and then after the settlement divided and me having the biggest family would get the most—that's the thing that changed my mind about keeping Mr. Mandell and Mr. Wright."

Mrs. Thomas reiterated that the reason she changed lawyers was that she wanted to be represented alone and not with a group. She used such language as "that

is the sole reason," or "only" reason. She gave the following testimony concerning a conservation she had with Mr. Wood and Mr. Barnhart when they called on her to discuss the matter:

"A I told them this, that—what I have already told you gentlemen about it. They wanted to know what the trouble was and I told them just as I told you before, about the group.

"Q About the group?

"A Uh-huh.

"Q And that's the only reason you told them?

"A That's right.

"Q That's the only type of complaint you made?

"A That's it.

"Q You didn't accuse them of fraud, or—

"A Oh, no.

"Q In any way, shape or form?

"A No.

"Q And you didn't accuse them of misrepresenting anything to you?

"A No, other than the group. I explained that to them."

She also gave this testimony at her deposition:

"Q And at the time you signed the contract with Mr. Mandell here—I believe it's Plaintiff's Exhibit 1—you intended to convey to them one-third interest in the claim?

"A At the time?

"Q At that time.

"A At that time, before I decided that I would change.

"MR. BLAND: I believe that's all.

"A When you hear of them on all sides, you need a lawyer—you need a lawyer and the other lawyer's the only lawyer available at the time, well, then what else can you do when you are in shock and don't know half of what you are doing?"

There is evidence that a contest was filed to a limitation of liability proceeding filed in the United States District Court for the Eastern District of Texas, and that claims were filed in appellant's behalf. Appellees performed certain work in the case prior to the repudiation of the contract by Mrs. Thomas and attempted to perform the services called for by the contract after the repudiation. It appears that the case was settled by Mr. Schwartz and Mr. Hannah on behalf of Mrs. Thomas and the minor children for the sum of $60,000.-00. A copy of the judgment entered in the case was attached to appellees' brief, and it appears that the money was paid into the registry of the court subject to its further orders. It also appears that by order of the court this money was invested for the use and benefit of Enola Mae Thomas and minors, Byron K., Myrna C., Stephnie, Arnold J., and Douglas F. Thomas, and attorneys, Newton B. Schwartz, Mack H. Hannah, III, and Mandell & Wright.

In the interest of fairness we present a summary of the testimony of Herman Wright, some of which we cannot consider under the rules which we must observe in considering appeals from summary judgments.

Mr. Wright testified that he and Mr. Johnson visited with Mrs. Thomas on the 25th of October by prearrangement. Mrs. Thomas was interested in learning whether Mr. Johnson had any information indicating a possibility that her husband might have survived. Mrs. Thomas demonstrated considerable concern as to what she and her children were going to do if her husband was dead. Mr. Johnson then explained to her that the company would pay earned wages and a $500.00 clothing allowance, which should be forthcoming promptly. He explained the union pension and welfare benefit which she would receive, and also stated that he believed that the company carried war risk insurance, which he thought would be paid to her promptly. Mr. Wright

pointed out that she probably would not receive the war risk insurance, the pension and welfare benefits, social security benefits, or the proceeds of any private insurance policies until the Coast Guard issued a presumptive death certificate, which would result in some delay. She expressed some concern that these benefits would not last very long considering the fact that she had five minor children at home. Mr. Wright then explained that these benefits accrued to her without regard to any fault on the part of the vessel or its owners, and that she and her children might very well be entitled to damages. He told her that the Coast Guard would shortly set up a Board of Investigation for the purpose of trying to ascertain the cause of the disaster and that in the course of the hearing "some idea could be gotten as to whether or not she might be entitled to any money over and above these items." He explained that he, as the Union's attorney, expected to participate in the hearing. She then wanted to know "if in connection with the damages" she could hire the union attorney and he told her that she could. She said that she wanted to talk to her oldest son expected to be home on leave soon. He then explained that the company would probably file a suit in an attempt either to exonerate itself from any liability for damage or alternatively to limit its liability. He explained that she would receive a notice of the filing of this lawsuit and that she should then promptly contact a lawyer "because this was a matter of considerable importance to her and to the children." He told her that the sooner she got a lawyer the better. At the time "she was considerably upset because she still had some feeling that her husband might be a survivor." He wouldn't say she was in shock. Mr. Johnson told her that Mr. Patton, the union agent, was in New Orleans meeting the ship bringing in most of the survivors and that when he got back he could give her firsthand information about any possibility of her husband surviving and that he felt sure Mr. Patton would contact her as soon as he could.

On the 27th of October Mr. Wright and Mr. Patton attended the Coast Guard hearing and on returning to the Union Hall learned that Mrs. Thomas had called and "wanted us to come back out." He and Mr. Patton then drove to her home. Her son was present. Mr. Patton told some of the details of the sinking and gave his opinion that there was no possibility that her husband had survived. After further conversation Mrs. Thomas stated that she had talked with her son and "that she and her son had decided they wanted to employ my office." He thanked her; filled out a retainer agreement; explained to her that "we would represent her on a contingency fee basis and she would assign us a third interest in her lawsuit, or whatever amount of money we got for her * * *" He handed her the contract. She gave it to her son, who read it. She signed it. He explained to her that the law required that "any action taken be through an administrator of his estate and that it would be necessary for us to take out administration on her husband's estate." He asked that in the next couple of weeks she go through her husband's papers to find "income tax returns, marriage certificates, birth certificates,—things of that kind" and that someone from the office would come back to get more detailed information and to arrange for her appointment as administratrix. He gave her his card and he left with Mr. Patton.

At the time he attended the Coast Guard hearing before he was employed by Mrs. Thomas, he had been employed by James Hiott and was also representing the Union. He testified that Mrs. Thomas called him on November 2 and told him she had changed her mind and told him that she wanted to discharge "us". He received the letter discharging him on November 4. He filed an answer and claim for her in the United States District Court despite her lack of cooperation.

He told Mrs. Thomas that anything he did in assisting in collecting war risk insurance or anything he did "along that

line" to assist her "would be for no charge." He would not have charged for the services if he had taken out the administration. He was never given any reason for his discharge.

Mr. Wright gave the following testimony:

"Q Now, after October 27th, what particular work have you or any member of your firm or employee or anybody for whom you all are responsible done in connection with preparing her case as opposed to work that's being done for other clients and/or the union in this matter— if I make the question clear. If not I will try and state—

"A I have done everything that I knew to do considering my inability to secure her cooperation.

"Q Well, sir, I am interested now in terms of time—hours work, exclusively for her and particularly for her.

"A Well, aside from filing her claim and answer by letter and to whatever extent attendance on the Coast Guard hearing, might be of some assistance— this is the extent of what I could do at the moment."

The contract of employment reads:

## CONTRACT OF EMPLOYMENT OF ATTORNEYS

STATE OF TEXAS ⎫
COUNTY OF HARRIS ⎭ KNOW ALL MEN BY THESE PRESENTS:

"That MANDELL & WRIGHT, a law partnership, are hereby employed to represent the undersigned in the prosecution of the following claim:

Joseph Thomas     (deceased husband)     Gulfstag

"That said attorneys are authorized to sue for and recover all damages and compensation to which the undersigned may be entitled as well as to compromise and settle said claim for such sum of money as to them shall be deemed to be to the best interest of the undersigned; and said attorneys are hereby appointed and constituted agents and attorneys-in-fact to execute in the name and on behalf of the undersigned all necessary releases, receipts, acquittances, settlements, discharges, notices or satisfactions of awards, judgments or recoveries of whatsoever character, and generally do all acts and things which in their judgment are essential to their handling of this matter. That in consideration of such services rendered and to be rendered by said attorneys, there is hereby transferred and assigned to them a one-half interest in said claim and cause of action, and in any compromise, settlement, judgment, or recovery thereupon; provided, however, that if said claim and cause of action be such that the fee allowed to an attorney is set by law, the interest hereby assigned to said attorneys shall be limited to the maximum so allowed by law. In the event my case is compromised before trial I agree to pay ____1/3____ of the amount recovered as attorney's fees.

"That costs of court and all reasonable expenses incurred by said attorneys in their handling of this claim and cause of action shall be by them deducted from that portion thereof not hereinbefore assigned and conveyed to them.

"Executed at ____Pt. Arthur____, this ____27____ day of ____Oct____, A. D. 19_66_

X  /s/  Mrs. Enola Mae Thomas"

The affidavit of Newton B. Schwartz states that he is an attorney of record in Civil Action 5343 in the United States District Court for the Eastern District of Texas and that the attorneys for Gulf Oil Corporation have offered to settle Mrs. Thomas' claims (both individually and those held in a representative capacity) for a total sum of $60,000.00, which she desires to accept. He states that various claimants were represented in this suit by five or six attorneys or firms, and that "numerically most of the claims from the outset were represented by Messrs. (Jack C.) Benjamin and (Abraham E.) Freedman, respectively the Gulf Coast and General Counsel for the National Maritime Union."

He also stated in this affidavit that "all work done in filing claims and answers, from the time of referral of Mrs. Thomas' claims to me by Mack H. Hannah, III, through the obtaining of the settlement was done without any assistance from Mandell & Wright."

We observe that Mrs. Thomas sued in her individual capacity and that she was not sued in any representative capacity, nor were the minor children made parties to this suit. We also point out that the contract of employment under consideration does not mention any cause of action accruing to the estate of the deceased, or to the minor children. This Court, therefore, does not undertake to determine the rights, if any, of those not parties to this suit to the fund in the registry of the United States District Court. While the judgment of the trial court construed the contract of employment as conveying to Mandell & Wright the one-third undivided interest in the cause of action for damages or other amounts due and owing to Mrs. Thomas, or the Estate of Joseph Thomas, no point of error relating to the inclusion of the Estate of Joseph Thomas has been presented to this Court. There is, however, a point relating to the ambiguity of the description of the claim conveyed to appellees and the contention that an issue of fact existed as

to what was intended to be conveyed or covered by the contract of employment.

The description of the claim as set out in the contract is so indefinite as necessarily to require parol evidence to define what was intended to be conveyed or covered by the contract. The contract indicates that only a portion of the interest owned by Mrs. Thomas was conveyed. The testimony of Mr. Wright indicates that it was contemplated that Mandell & Wright share in any recovery obtained for her in a representative capacity. This conclusion is reached only by inference from the testimony that he told Mrs. Thomas that the suit for damages would have to be brought by her as administratrix. It does not necessarily follow that there was a meeting of the minds on this matter. Mrs. Thomas testified that she did not remember that Mr. Wright explained anything to her except about the one-third. Mr. Wright's testimony does not establish facts necessary to explain the ambiguous description of the claim to prosecute which his firm was employed. It appears that Mrs. Thomas had other claims, actions, demands, and causes of action arising by operation of law by reason of the death of her husband. While the testimony of Mr. Wright was that his firm would have made no charge for assistance rendered in the collection of war risk insurance or anything along that line, the judgment of the trial court does not appear to be so limited. We note that appellant's brief states that the depositions were taken subject to any proper objections to the admissibility of the testimony at the trial. We note also that the receipt of the clerk of the United States District Court indicates that the minor children have an interest in the fund on deposit, and that neither the judgment of the trial court nor the contract indicates that any portion of their interest in the claim was conveyed unless the share in the settlement enuring to their benefit flows from the estate rather than from individual causes of action. Appellees have failed to sustain the burden of negativing the existence of issues of fact as to the na-

ture and extent of their interest in the claim for damages by reason of the death of Joseph Thomas.

Attention must also be directed to the fact that there is no statement of facts. The case was determined on summary judgment evidence only. The findings by the trial court relative to declaratory relief must be reviewed on the same basis as other summary judgments.

Appellant contends that an issue of material fact existed as to whether Mrs. Thomas, by reason of her physical condition, lacked capacity to voluntarily and knowingly execute the contract of October 27, 1966.

As has been pointed out the contract was executed three days after the death of her husband in a disaster at sea. With reference to the date the contract was signed Mrs. Thomas testified that she was "in shock" and didn't know half of what she was doing. If we give credit to the testimony of both Mr. Wright and Mrs. Thomas in instances where it is not contradictory, we must conclude that three months after the conversations leading to the execution of the contract she remembered very little of the conversations, and draw the inference that she did not at the time understand what was being said because of her physical condition. She did, however, understand that she was employing lawyers to represent her in a suit for damages by reason of the death of her husband, and was agreeing to pay them one-third of any sum they might recover for her. An issue of fact is raised by this testimony. "One of the tests of the right to rescind or avoid a contract is whether the contracting party, at the time of making the agreement, possessed sufficient mental capacity to know and understand the nature and consequences of his act in entering into the contract." 13 Tex.Jur.2d, Contracts, § 10.

There must be a meeting of the minds of the parties to the same thing in the same sense at the same time. The as-

sent of both parties must comprehend the proposition as a whole. 13 Tex.Jur.2d, Contracts, § 14, pp. 127–128.

We find no testimony of fraud or misrepresentation on the part of appellees, or any of the union representatives, or that appellant relied on any misstatement of fact in entering the contract of employment. Williamson v. Lewis, 346 S.W.2d 957 (Ft. Worth Tex.Civ.App., 1961, writ ref.); Avery Co. of Texas v. Harrison Co., 267 S.W. 254 (Tex.Com.App., 1924).

It does not appear that at the time the contract was signed a conflict of interest necessarily existed by reason of the fact that appellees represented James Hiott. The evidence as to whether such a conflict subsequently arose is not sufficiently developed for our appraisal. Apparently if such a conflict arose, this happened after the contract was breached by appellant. The disputed issue of fact as to whether appellees made a full disclosure of the facts is immaterial. It is undisputed that either prior to, or immediately after, the contract was signed, and at the same meeting, Mrs. Thomas was informed that appellees represented other claimants, and that she made no protest at the time. We cannot conjecture as to what course of conduct might have been pursued had the contract not been terminated by appellant. Neither party has briefed the question as to whether the violation by an attorney of a provision of the Canons of Ethics, promulgated by the Supreme Court of Texas in connection with the State Bar Rules, constitutes a sufficient basis for the termination of his contract of employment. We do not express an opinion on the question. See State Bar Rules, Article XIII, Canons of Ethics.

Appellees recognize that a client may terminate the relationship of attorney and client at any time the client chooses, with or without cause, and without regard to the terms of any employment contract which purports to give the attorney a continuing right to represent the client. They correctly point out, however, that this does

not mean that when a client discharges an attorney without sufficient cause the client is relieved of that portion of the contract which fixes the attorney's compensation.

When an attorney holds a contingent fee contract which assigns to him as his compensation an undivided interest in the client's cause of action, the attorney may recover on the contract for the entire amount of his compensation when the client discharges the attorney prior to the completion of the work when the attorney has been guilty of no misconduct. Myers v. Crockett, 14 Tex. 257 (1855); White v. Burch, 19 S.W.2d 404 (Ft. Worth Tex.Civ. App., 1929, writ ref.); White v. Burch, 33 S.W.2d 512 (Ft. Worth Tex.Civ.App., 1930, writ ref.); Cottle County v. McClintock & Robertson, 150 S.W.2d 134 (Amarillo Tex. Civ.App., 1941, writ dism'd, judgment cor.).

■ There is no merit in appellant's contention that the contract cannot be enforced in that it is contrary to the public policy of the State of Texas because, inter alia, the contract provides that Mandell & Wright may compromise and settle the claim and sign "all necessary releases, receipts, acquittances, settlements, discharges, notices or satisfactions of award, judgments or recoveries of whatsoever character, and generally do all acts and things which in their judgment are essential to the handling of this matter."

It is generally recognized that parties dealing at arm's length have a wide discretion as to the terms of the contracts into which they may wish to enter. In essence the provision of the contract under discussion constitutes a general power of attorney with respect to this particular claim only. Such a contract is not unique, and the grantor of such a power is not without remedy in case the power is abused, or the confidence reposed in the grantee violated to the grantor's injury. Gulf, C. & S. F. Ry. Co. v. Miller, 21 Tex.Civ.App. 609, 53 S.W. 709 (1899, no writ); 13 Tex.Jur.2d, Contracts, § 1, pp. 108–109.

All other assignments of error have been carefully considered and it is improbable any of these questions will arise at a trial on the merits. In any event, these assignments are overruled.

The judgment of the Trial Court is reversed and the cause is remanded to the Trial Court.

Reversed and remanded.

### On Motions for Rehearing

In their motions for rehearing appellees have charged the Court with gross error in holding "that the claims of the minors (children of Joseph Thomas, deceased, and appellant) flow from the estate of the decedent rather than from individual causes of action." After carefully reviewing our opinion we find no language suggesting such a holding. The trial court construed the contract as conveying to Mandell & Wright a one-third interest in all claims, etc. for damages or other amounts due and owing to Mrs. Thomas, or the estate of Joseph Thomas, deceased, because of the death of Joseph Thomas.

In our opinion we noticed that the trial court did *not* hold that appellees had been assigned an interest in the individual causes of action owned by the minor children, *unless* their causes of action flowed from the estate.

The literal wording of the contract indicated that Mrs. Thomas was assigning only a portion of her individual claim. There was nothing in the contract to indicate that she was acting as trustee, personal representative, or administratrix, at the time she signed the contract, nor did the evidence conclusively establish that she intended to so act, or that she was acting in any such capacity. We, therefore, held that appellees failed to sustain the burden of negativing the existence of issues of fact as to the nature and extent of their interest in the claim, rather than holding, in this summary judgment proceeding, that appellees had no interest in that portion of the claim

belonging to the minor children, or to the estate of Joseph Thomas. It may be that these points were not fully developed by the summary judgment evidence. These and other points were pointed out for the guidance of the trial court in future proceedings. We sustained the appellant's point that the description of the claim conveyed to appellees was ambiguous, and, since the ambiguity was not resolved by the evidence, we reversed the case and remanded it to the trial court.

Appellant raised in her original brief and in her motion for rehearing points concerning conflicts of interest citing certain paragraphs of the Texas Canons of Ethics. We did not consider that the points had been briefed in sufficient depth to require a more extended discussion than that appearing in our original opinion. In view of the disposition made of the case, and the paucity of evidence bearing on the issues, we remain of the same opinion.

The other points raised in the respective motions for rehearing have been considered, and are overruled since the Court feels that they were correctly decided and sufficiently discussed in our original opinion.